UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JULIUS A. COLEMAN,

Plaintiff,

v.

DAVID R. MOLDENHAUER,
P.O. KIRBY and LT. MASTROCOLA,

Defendants.

Case No. 14-CV-1234-JPS

ORDER

The plaintiff, Julius A. Coleman, ("Coleman") brings this action pursuant to 42 U.S.C. § 1983 against three Wauwatosa police officers. Coleman alleges that the defendants used excessive force and battered him during his arrest.

Both Coleman and the defendants brought motions for summary judgment (Docket #19, #28, #48). The motions are now fully briefed and ready for disposition. As discussed more fully below, factual issues exist to preclude judgment as a matter of law, and, thus, the Court will deny both motions for summary judgment.

## 1. FACTUAL BACKGROUND[1]

The facts of this case relate to Coleman's arrest on June 10, 2011. In short, Coleman alleges that the defendants used excessive force in executing the arrest, whereas the defendants maintain they used only reasonable force.

### 1.1 The Investigation

In May 2011, Wauwatosa Police Officer David A. Cefalu ("Cefalu") had contact with Wauwatosa Confidential Informant C.I. 11-156 ("C.I.").

[1]The facts are taken from the defendants' proposed finding of fact ("DPFF") or Coleman's proposed finding of fact ("PPFF") unless otherwise noted. (Docket #20, #29).

(DPFF ¶ 1).[2] C.I. 11-156 told Cefalu that he knew a black male that went by the name "JuJu." (DPFF ¶ 2). Using a law enforcement database, Cefalu was able to identify "JuJu" as an alias for Julius A. Coleman, male/black with a date of birth of February 3, 1984. (DPFF ¶ 3).

The C.I. told Cefalu that he knows that Coleman carries a .38 revolver and that Coleman had drug deals in the past for money, drugs and vehicles. (DPFF ¶¶ 4, 5). The C.I. told Cefalu that the C.I. told Coleman that he knew a drug dealer named "Poncho" who dealt large quantities of drugs and had large amounts of cash. (DPFF ¶ 6). Coleman suggested a plan to the C.I. to rob the drug dealer with an accomplice. (DPFF ¶ 7).

On May 18, 2011, the C.I. made a recorded/monitored phone call to Coleman. During the call, they discussed Coleman robbing the drug dealer. Coleman stated all he needed was the address.(DPFF ¶ 8). On May 23, 2011, the C.I. made a recorded/monitored phone call to Coleman and met with Coleman. During the call/meet, they discussed the robbery. Coleman made a statement that he had a .357, a "K" (AK47) and a .40. (DPFF ¶ 9). On June 3, 2011, the C.I. made a recorded/monitored phone call to Coleman and met with Coleman. During the phone call/meet, they discussed the robbery. Coleman talked about having a .44 chrome gun and a .357. (DPFF ¶ 10).

On June 7, 2011, the C.I. made a recorded/monitored phone call to Coleman. During the call, Coleman told the C.I. he was going to call his guy

---

[2]The Court notes that Coleman failed to submit responses to the defendants' proposed finding of fact in violation of Civil L.R. 56(b)(2)(B). Civil L.R. 56(b)(4) provides that the Court "will deem uncontroverted statements of material fact admitted solely for purpose of deciding summary judgment." Coleman verified his complaint, however, and the Court may consider it to the extent that Coleman's allegations are based on personal knowledge. See 28 U.S.C. § 1746; Fed. R. Civ. P. 56(e); *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996).

"Tez" to be an accomplice. The C.I. told Coleman that the drug dealer was leaving town on either June 10 or June 11. (DPFF ¶ 11).

On June 9, 2011, at approximately 10:10 p.m., the C.I. received a phone call from Coleman. The C.I.'s phone battery died and the C.I. then made a recorded/monitored call to Coleman. (DPFF ¶ 12). During the call Coleman stated he was coming from downtown and had to go and grab a gun first. (DPFF ¶ 13). During the conversation, Coleman stated the police better not get involved "cuz I'm shooting at them mutha-fuckers." (DPFF ¶ 14). Coleman told the C.I. that he was bringing "Tez" and another male named "Meal." (DPFF ¶ 15).

Between 10:54 p.m. on June 9, 2011, and 1:00 a.m. on June 10, 2011, there were numerous phone calls between the C.I. and Coleman. Coleman told the C.I. that "Meal" was no longer coming but that he and "Tez" were coming with a gun. (DPFF ¶ 16). At about 12:35 a.m., on June 10, 2011, Coleman told the C.I. that he would meet the C.I. at North 76th Street and Burleigh Street. (DPFF ¶ 17). At about 1:00 a.m., Cefalu observed a vehicle traveling on W. Burleigh Street and pull behind the C.I.'s vehicle. (DPFF ¶ 18). The vehicle parked and the driver (later identified as Coleman) exited the vehicle. (DPFF ¶ 19). Coleman opened the hood of the vehicle and it looked like he was trying to retrieve something.[3] (DPFF ¶ 20).

Coleman had two other individuals, Eldridge L. Simon ("Simon") and Onterio M. Girley ("Girley"), with him when he arrived at the C.I.'s location. (DPFF ¶¶ 21, 22). At about 1:04 a.m., on June 10, 2011, the C.I., Coleman, Simon and Girley left southbound on North 76th Street in the C.I.'s vehicle.

---

[3]Defendants note that it was later determined that Coleman retrieved a handgun from under the hood compartment. (DPFF ¶ 20). It is unclear from the record when or how the officers discovered this fact.

(DPFF ¶ 23). Unmarked police vehicles continuously followed the C.I.'s vehicle as it traveled to the designated "take down" area. (DPFF ¶ 24).

At about 1:16 a.m., the C.I. pulled into the Western Building Products parking lot and parked. This was the area that had previously been selected as the "taken down location." (DPFF ¶ 25). While parked, the C.I. discussed the specifics of the robbery and pointed out the apartment building to Coleman, Girley and Simon where the robbery was to occur. (DPFF ¶ 26). The C.I. told Coleman, Girley and Simon that he would call Coleman after making contact with the alleged drug dealer who was to be robbed. (DPFF ¶ 27). The C.I. then exited the vehicle to make contact with the alleged drug dealer. (DPFF ¶ 28).

1.2 Coleman's Arrest

The plan was for the C.I. to exit the vehicle and then the Wauwatosa Special Response Team would arrest the suspects remaining in the vehicle. (DPFF ¶ 29). Prior to the C.I.'s vehicle arriving at the "take down location," Cefalu told the Special Response Team that the suspects had a gun and that if the police got involved there was going to be a shootout. (DPFF ¶ 30.) After the C.I. exited the vehicle, the Special Response Team moved into position to make the arrests. (DPFF ¶ 31).

Several flash bangs were deployed as the Special Response Team arrived in position to make the arrests. (DPFF ¶ 32).[4] Coleman alleges that the flash bangs were shot into the vehicle (Compl. at 2), whereas the defendants provide no further detail with respect to the flash bangs. Detective Romeis (not a defendant) positioned the "Bear Cat," which is a

[4]The record contains no information regarding who shot the flash bangs or the number of flash bangs used.

tactical vehicle used in high risk situations, directly behind the rear bumper of suspect's vehicle. (DPFF ¶¶ 32, 33).[5]

After the flash bangs were deployed, defendant P.O. Kirby used a P.A. System to direct Coleman and the other vehicle occupants to put their hands in the air. (DPFF ¶ 34). One of the suspects did comply with the orders, but one of the suspects appeared to dive onto the floor between the front and back seats.[6] (DPFF ¶ 35). Using the P.A. System, P.O. Kirby continued to order the suspects to raise their hands and comply with the orders. After several minutes, it appeared that the suspects were still not complying with the orders. (DPFF ¶ 36).

At this point, the officers allege they feared for their safety because they knew that the suspects had a gun and threatened a shootout if the police became involved. (DPFF ¶ 37). The police were concerned that the suspects were "formulating a plan or barricading themselves within the vehicle." (DPFF ¶ 38). Defendant Moldenhauer ordered defendant Kirby to shoot out the rear and side windows of the vehicle with less lethal rounds from a 40mm gas gun. (DPFF ¶ 38). With the windows shot out, the officers could see the suspects in the vehicle. (DPFF ¶ 39). Someone again ordered the suspects out of the vehicle and this time they complied and the officers took them into custody. (DPFF ¶ 40).

During a search of the vehicle, a Lorcin Model 380 semi-automatic handgun was recovered with a magazine containing five cartridges (DPFF

---

[5]The record is unclear as to whether the Bear Cat moved into position before or afer the deployment of the flash bangs.

[6]The record is unclear as to who was able to see the suspects.

¶ 42). Following a trial before a jury, Coleman was subsequently found guilty of being a felon in possession of a firearm and bail jumping. (DPFF ¶ 41).

2. LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund,* — F.3d —, 2015 WL 499571, at *5 (7th Cir. Feb. 6, 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz,* 2015 WL 499571, at *5. When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *See Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir. 1989). When a court denies a motion for summary judgment it "reflects the court's judgment that one or more material facts are disputed or that the facts relied

on by the motion do not entitle the movant to judgment as a matter of law." *Hotel 71 Mezz*, 2015 WL 499571, at *6.

## 3. DISCUSSION

Coleman's motion for summary judgment argues that he is entitled to judgment as a matter of law because the defendants' actions during his arrest were objectively unreasonable. In contrast, the defendants argue that they are entitled to judgment as a matter of law on both the Fourth Amendment claim and state law battery claim because: (1) their use of force was objectively reasonable; (2) they are entitled to qualified immunity because the law was not clearly established at the time of the incident; and (3) discretionary act immunity shields them from a state law claim of battery. As discussed in detail below, the Court finds that factual issues preclude summary judgment and, on the state of the record before the Court on summary judgment, the defendants are not entitled to immunity on either the Fourth Amendment claim or the state law battery claim.

### 3.1 Fourth Amendment—Excessive Force

The defendants' actions that Coleman alleges were excessive during his arrest include: (1) the use of the flash bang devices; and (2) the less lethal rounds from a 40mm gas gun to break the windows in the vehicle. As an initial matter, the Court notes that the facts regarding the specific force the defendants used are far from clear; the record before the Court is replete with missing details. Neither party provides any details as to what the terms "flash bang" and "less lethal rounds from a 40mm gas gun" specifically entail. Further, neither party provides any information as to the specific number of flash bangs or less lethal rounds the officers used during the arrest. And finally, there is nothing in the record regarding the deployment

location of the flash bangs in relation to Coleman. The Court now turns to discuss the legal standard that applies to excessive force during an arrest.

### 3.1.1 Legal Standard

Police officers are entitled in appropriate circumstances to use force, up to and including deadly force. But it is also the case that the Constitution forbids the use of excessive force. The question whether a particular use of force has crossed the constitutional line is governed by the Fourth Amendment, which prohibits unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

> The Fourth Amendment protects against unreasonable seizures, not seizures that "shock the conscience" or cause "severe injuries." If, under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself (regardless of the officer's motive or whether any injury inflicted was severe) crosses the constitutional threshold.

*Lester v. City of Chi.*, 830 F.2d 706, 712 (7th Cir.1987); *see also Graham*, 490 U.S. at 397 ("The reasonableness inquiry is an objective one. The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). To decide whether the amount of force used was excessive, the court must "examine the totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000).

Relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to

evade arrest by flight." *Graham*, 490 U.S. at 396. Of course, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Thus, courts must examine the reasonableness of the actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). Courts defer to a jury's determination of what occurred during an arrest or whose testimony is credible. But a constitutional tort is not "an analog of civil negligence." *Id.* In a traditional negligence case, we permit the jury to determine whether conduct was reasonable under the circumstances. In an excessive force case, while we accept the factual inferences made by the jury, we must independently review the jury's interpretation of what is reasonable under the Fourth Amendment. *Id.; cf. Ornelas v. United States*, 517 U.S. 690, 697 (1996) ("A policy of sweeping deference [by appellate courts to factfinders' determinations of probable cause] would permit…the Fourth Amendment's incidence to turn on whether different [factfinders] draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. Such varied results would be inconsistent with the idea of a unitary system of law." (internal quotation marks, alterations, and citation omitted)).

As to the specific use of flash bangs, the Seventh Circuit has indicated that "the use of flash bang devices should be limited and is not appropriate in most cases." *Estate of Escobedo v. Bender*, 600 F.3d 770, 784 (7th Cir. 2010). "[T]he police call them 'distraction devices,' an absurd euphemism; we called

them 'bombs' in *Estate of Escobedo v. Bender*, 600 F.3d 770, 784–85 (7th Cir. 2010), and *United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir. 2000)." *Milan v. Bolin*, 795 F.3d 726, 729 (7th Cir. 2015). In *United States v. Folks*, 236 F.3d 384 (7th Cir. 2001), the court discussed, in dicta, the potentially serious injuries that may arise from the use of a flash bang device during a search. The court suggested that a sufficiently careful (or perhaps reasonable) use of a flash bang device occurs when officers take a moment to look inside a residence or a room to ensure that no one would be injured by the device before tossing it and where officers carry a fire extinguisher to quickly extinguish any fires resulting from deployment of the device. *Id.* at 388.

In *Milan*, the Seventh Circuit recently examined the state of the law regarding the use of flash bangs. The court stated that, "'the use of a flash bang is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher.'" 795 F.3d at 729 (quoting *Escobedo*, 600 F.3d at 784–85). The court upheld the district court's denial of qualified immunity because the police in that case "flunked the test just quoted."

3.1.2 Analysis

In this case, the record before the Court is unclear about the nature and extent of the force the defendants used; too many factual issues remain unclear and this is a question for the jury. The defendants' entire argument on the excessive force claim can be summed up as a page-long quote from *Hernandez v. Conde*, 442 F. Supp. 2d 1141 (D. Kan. 2006), which discusses the reasonableness of flash bang grenades. (Defs' Opening Br. at 7). The defendants completely fail to discuss any of the relevant Seventh Circuit

cases discussed above that relate to the use of flash bangs. Without any analysis, defendants conclude that the amount of force was reasonable and necessary to effectuate the arrest of Coleman and his accomplices. (Defs' Opening Br. at 7-8).

To begin, the Court recognizes that Coleman was a dangerous suspect. The undisputed facts show that, prior to his arrest, Coleman and his companions believed they were going to rob a drug dealer with a firearm. In Wisconsin, robbery with the use of a dangerous weapon is a Class C felony, Wis. Stat. 943.32(2).[7] In light of these facts, the Court finds that Coleman and his companions would be considered dangerous suspects.

Next, whether Coleman posed an *immediate* threat to the police or others is questionable, particularly in relation to the use of the flash bangs. On the one hand, Coleman certainly posed some level of threat or potential threat because he was armed and previously stated there would be a shootout if the police became involved. On the other hand, however, there is nothing in the record to suggest that Coleman or his accomplices posed an immediate threat, that is to say, he was taking action that could at any moment harm police or the public, prior to the deployment of the flash bangs. For example, "he did not wave his gun out the window (or even open or come near the windows), point his gun at officers or the public, fire his gun inside his [car]...or even state that he would shoot officers or members of the public." *See Escobedo v. City of Fort Wayne*, No. 1:05-CV-424-TS, 2008 WL 1971405, at *1 (N.D. Ind. May 5, 2008). Indeed, the nature of the officers'

---

[7]Coleman was never convicted of any robbery crime in relation to this incident. The record reflects that Coleman was later found guilty of "felon in possession of a firearm and bail jumping at a jury trial." (DPFF ¶ 41).

covert sting-operation made it likely that Coleman had no knowledge of any police involvement at any point prior to the use of flash bangs.

The third *Grahm* factor, whether the suspect was actively resisting arrest or attempting to flee, is also questionable given the complete lack of a detailed record. The Court reiterates that prior to the deployment of the flash bangs, it appeared that Coleman and the other occupants had no knowledge of any police presence; thus, they did not actively resist arrest or attempt to flee at this time.

As to the use of the less lethal rounds, it is unclear whether Coleman and the other occupants' actions could be described as actively resisting arrest. On the one hand, Coleman does not dispute that one of the officers saw a suspect dive between the seats and could only see two of the three occupants with their hands up. On the other hand, the officers' orders to put their hands up came immediately after the deployment of flash bang grenades. Flash bangs are "explosive devices...that are intended to stun and disorient persons, thus rendering them harmless, by emitting blinding flashes of light and deafening sounds." *Milan v. Bolin*, 795 F.3d 726, 729 (7th Cir. 2015). Could the suspects hear the orders to put up their hands or even see the police officers?[8] Coleman alleges in his Complaint that "[a]s a result of the flash bangs that were shot into the Vehicle, Coleman was stunned and partially blinded for a short period of time." (Docket #1 at 2). Thus, it remains unclear whether a reasonable officer could even expect a suspect to comply with his or her orders after deploying flash bangs in the nearby vicinity.

---

[8]The undisputed facts indicate that after the deployment of the flash bangs, Coleman was heard, via the live wire, calling a female and telling her that "he, Girly, and another individual were getting arrested and Girly got caught with a gun." (PPFF ¶ 12).

Finally, material issues of fact exist as to the nature of the force the defendants used. Nothing in the record indicates just where the flash bangs were deployed in relation to Coleman. The Complaint alleges that the defendants shot the flash bangs "into" the vehicle, (Docket #1 at 2), whereas the defendants provide no details whatsoever. (DPFF ¶ 32) ("Several flash bangs were deployed as the Special Response Team arrived in position to make the arrests."). This missing detail leaves significant factual questions as to the reasonableness of the defendants' actions. *See Milan*, 13-CV-1-WTL-WGH, 2015 WL 71036 at *5 (S.D. Ind. January 6, 2015) (The Seventh Circuit has 'often emphasized the dangerous nature of flash-bang devices and has cautioned that the use of such devices *in close proximity to suspects may not be reasonable.*'" (quoting *United States v. Morris*, 349 F.3d 1009, 1012 (7th Cir. 2003))). Additionally, nothing in the record indicates whether the defendants carried a fire extinguisher with them at the time the flash bangs were deployed. *See Milan*, 795 F.3d at 726 (indicating that the use of flash bangs is *only* reasonable when, among other things, the police carry a fire extinguisher).

In light of the foregoing, the Court finds that there are questions of fact regarding whether the defendants' actions were unreasonable and excessive. Thus, summary judgment on this issue is not appropriate and the Court will deny both the defendants' and Coleman's motions for summary judgment as to this claim.

3.2 Qualified Immunity

In the alternative, the defendants argue that they are entitled to qualified immunity because the law was not clearly established in June 2011 to place them on notice that the use of flash bang devices and less lethal rounds from a 40mm gas gun in these particular circumstances was

unconstitutional. Aside from laying out the general qualified immunity standard, the defendants cite no cases to support their argument and summarily conclude that they are entitled to qualified immunity because the "issue is whether a reasonable officer would have believed that the use of flash bangs and less lethal 44mm gas guns was reasonable when facing armed individuals in the situation these Defendants faced." (Defs' Opening Br. at 11).

Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015). Qualified immunity is not a defense, it is an immunity from suit, *i.e.*, an entitlement not to stand trial. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, the Supreme Court has repeatedly emphasized the importance of resolving qualified immunity at the earliest possible stage in litigation. *Pearson*, 555 U.S. at 232.

A court must answer two questions to determine if qualified immunity applies: first, whether a constitutional right "would have been violated," *Viilo*, 547 F.3d at 710 (quoting *Saucier*, 533 U.S. at 200); and, second, "whether the right at issue was clearly established at the time and under the circumstances presented." *Beaman*, 776 F.3d at 508; *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).[9] To answer the first question, "a court must

---

[9]Prior to 2009, courts were instructed to analyze the questions in order, *see Pearson*, 555 U.S. at 232 (noting that *Saucier* made addressing the questions in order "a mandate"), but in *Pearson* the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.

decide whether the facts that a plaintiff has alleged…make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).

A plaintiff can provide the answer to the second question—whether a right was "clearly established" at the time and under the circumstances presented—"in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman*, 776 F.3d at 508 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."); *Viilo*, 547 F.3d at 710-11. Thus, novel factual circumstances are no bar to showing a clearly established right, "so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional." *Beaman*, 776 F.3d at 509 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) ("A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting *Saucier*, 533 U.S. at 202).

As discussed above, Coleman has alleged sufficient facts to withstand summary judgment on his excessive force claim. As to the second prong, whether the law was clearly established as of June 10, 2011, that the force used by the defendants to arrest Coleman may violate the Fourth Amendment right to be free from excessive force, the Court finds that it was.

As noted above, the Seventh Circuit in *Milan* recently examined the state of the law regarding the use of flash bangs as of April 5, 2010. The court

stated that, "'the use of a flash bang is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher.'" 795 F.3d at 729 (quoting *Escobedo*, 600 F.3d at 784–85). The court upheld the district court's denial of qualified immunity because the police in that case "flunked the test just quoted."

Given this test, the Court finds that the law regarding the use of flash bangs was clearly established on June 10, 2011, when the defendants arrested Coleman. As discussed above, serious factual questions remain as to whether the defendants' actions were reasonable in light of this test, including, but not limited to: (1) the record is silent as to the defendants' use of a fire extinguisher; (2) the record is silent as to the proximity of the flash bangs to Coleman and whether the defendants deployed them inside or outside of the vehicle; and (3) it is questionable whether the vehicle posed a "dangerous point of entry." In taking the facts most favorable to the plaintiff, as the Court must do in examining qualified immunity, the defendants would "flunk" the *Milan* test. A reasonable officer in the defendants' position would have known that, under Coleman's version of events, deploying flash bangs inside a vehicle in close proximity to suspect's who did not pose an immediate threat to the officers, without the use of a fire extinguisher, was an excessive use of force.

Finally, as to the defendants use of "less lethal rounds from a 40mm gas gun," the Court finds that factual issues preclude summary judgment on this issue as well. The location of the flash bangs when deployed is crucial in the Court's analysis of whether the defendants' use of additional force was

reasonable. In taking Coleman's version of events, that the flash bangs went off inside the car and that he was stunned and partially blinded for a short period of time after the flash bangs (Docket #1 at 2), the Court is unable to uphold a finding of qualified immunity. The defendants allege they used the less lethal rounds because Coleman or his associates refused to obey orders and put their hands up. However, defendants deployed a "bomb" intended to stun and disorient persons by emitting flashes of light and deafening sounds, *see Milan,* 795 F.3d at 729, but nonetheless expected the suspects to comply with orders before using additional force? Under this version of events, the Court finds that the defendants would meet the alternative standard of plainly excessive conduct. *See Weinmann v. McClone,* 787 F.3d 444, 451 (7th Cir. 2015) ( finding that the shooting of a suspect while passively sitting in a chair with a gun across his lap would meet the alternative standard of plainly excessive conduct).

Accordingly, on the basis of this record, the Court is unable to conclude that the defendants are entitled to qualified immunity on Coleman's Fourth Amendment excessive force claims. Thus, the defendants' motion for summary judgment will be denied on this claim.

3.3 State Law Battery Claim

The Court has supplemental jurisdiction over state law claims "that are so related" to pending federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). For claims to be part of the same case or controversy, they must arise out of a common nucleus of operative fact. *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir. 1995). "A loose factual connection between the claims is generally sufficient." *Id.* The Court has supplemental jurisdiction

over Coleman's state law battery claim against the defendants because they arise out of the same incident as his Fourth Amendment claim.

The defendants argue that Coleman's state law battery claim cannot survive because they are entitled to discretionary act immunity. (Defs' Opening Br. at 8. Wis. Stat. § 893.80(4) affords municipal employees immunity from suit for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." The terms "quasi-legislative" or "quasi-judicial" are synonymous with "discretionary." *Willow Creek Ranch, LLC v. Town of Shelby*, 235Wis.2d 409, 425, 611 N.W.2d 693 (2000). Immunity for discretionary acts, however, does not apply to conduct that is "malicious, willful, or intentional." *Id.* The defendants argue that because their actions "were not performed maliciously, intentionally or willfully, [they] should enjoy immunity." (Defs' Opening Br. at 9). This conclusory argument, however, is unconvincing.

Under Wisconsin law, a police officer may be liable for the intentional tort of battery if he uses excessive force in making an arrest. *Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 984 (E.D. Wis. 2003) (citing *Kofler v. Florence*, 216 Wis.2d 41, 45, 573 N.W.2d 568 (Ct. App.1997)). There is evidence in the record that the defendants used enough force to cause Coleman to suffer physical injury. Thus, taking the facts in the light most favorable to Coleman, the Court cannot conclude as a matter of law that the defendants conduct was not malicious, willful and intentional, or that a reasonable jury could not find that they committed a battery. Thus, with respect to Coleman's battery claim, the Court will deny the defendants' motion for summary judgment.

4. CONCLUSION

In sum, the Court finds that significant factual issues preclude summary judgment for all claims. Thus, the Court will deny both Coleman's

motions for summary judgment as well as the defendants' motion for summary judgment and this matter will proceed to trial.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #28) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Coleman's motions for summary judgment (Docket #19, #48) be and the same are hereby DENIED;

Dated at Milwaukee, Wisconsin, this 2nd day of November, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge